# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| RODNEY STEVEN PERRY, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:17-cv-00216-TWP-DML |
| | ) |
| GREGG NOLL[1], PCF Dentist, and CORIZON HEALTH, | ) |
| | ) |
| Defendants. | ) |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DIRECTING ENTRY OF FINAL JUDGMENT

This matter is before the Court on Defendants Gregg Noll's, ("Dr. Noll") and Corizon Health's ("Corizon") (collectively, the "Defendants") Motion for Summary Judgment (Dkt. 54). Plaintiff Rodney S. Perry, Sr. ("Mr. Perry") brought this civil rights action pursuant to 42 U.S.C. § 1983 alleging that Dr. Noll violated his Eighth Amendment rights through his constitutionally inadequate provision of dental care and that Corizon is liable under Indiana state law for the misconduct of its employee. For the reasons explained below, the Defendants' Motion for Summary Judgment, Dkt. 54, is **granted**.

## I. SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material

---

[1] **The Clerk is directed to correct the caption in the docket to reflect the correct spelling of Dr. Noll's first name as Gregg rather than Greg**.

issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Local Rule 56-1(e) requires that facts asserted in a brief must be supported "with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." *Id.* In addition, the court will assume that the facts as claimed and supported by admissible evidence by the movant are admitted without controversy unless "the non-movant specifically controverts the facts in that party's 'Statement of Material Facts in Dispute' with admissible evidence" or "it is shown that the movant's facts are not supported by admissible evidence." Local Rule 56-1(f). The court "has no duty to search or consider any part of the record not specifically cited in the manner described in subdivision (e)." Local Rule 56-1(h); *see Kaszuk v. Bakery and Confectionery Union and Indus. Intner. Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986) ("The court has no obligation to comb the record for evidence contradicting the movant's affidavits."); *Carson v. E.On Climate & Renewables, N.A.*, 154 F. Supp.3d 763, 764 (S.D. Ind. 2015) ("The Court gives Carson the benefit of the doubt regarding any disputed facts, however, it will not comb the record to identify facts that might support his assertions.").

## II. FACTUAL BACKGROUND

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Perry as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

### A. Mr. Perry's Complaint

Mr. Perry's Amended Complaint alleges that on March 11, 2016, he was subjected to unnecessary pain when Dr. Noll improperly performed a tooth extraction procedure. Dkt. 17 at 3. He asserts that Dr. Noll administered four anesthetic injections and, upon administering the second injection, he inserted the needle improperly, resulting in dental paresthesia. Mr. Perry alleges that the needle caused excruciating pain when it damaged the nerve. As a result, he suffers from permanent loss of feeling in his lip, jaw line, and chin. He further alleges that Dr. Noll delayed follow-up treatment for nine months.

### B. Mr. Perry's Dental Care

On January 27 and February 1, 2016, Mr. Perry submitted two Requests for Health Care forms ("RFHC") to have his teeth examined and cleaned. Dkt. 56-2 at 1-2. He wrote that he suffered from periodontal disease, bleeding gums, and halitosis (bad breath). *Id.* On February 5, 2016, Mr. Perry was diagnosed with a cavity in tooth #18 that needed to be addressed before a full cleaning. Tooth #18 is a tooth on the bottom jaw. *Id.* at 3. It is the second tooth from the back in the left side of Mr. Perry's mouth, just before the wisdom tooth, which is tooth #17. Dr. Noll recommended that an occlusal resin be placed in tooth #18 and took bitewing x-rays of Mr. Perry's teeth.

3

On February 22, 2016, Dr. Noll restored the resin on tooth #18[2] using local anesthesia without incident. *Id.* That same day, Mr. Perry submitted RFHC #182833 in which he requested a cleaning. *Id.* at 7. On February 29, 2016, Dr. Noll performed an examination and noted no cavities. *Id.* at 3. Dr. Noll recommended that Mr. Perry be scheduled for a cleaning. *Id.*

On March 2, 2016, Mr. Perry submitted RFHC #196267 and stated he had a tooth filled and was eating when he felt excruciating pain shoot through his bottom jaw where the tooth was filled. *Id.* at 8. He stated that if the tooth could not be fixed, he wanted it extracted. *Id.*

On March 7, 2016, Mr. Perry came for his dental appointment and stated that tooth #18 started to hurt after biting down on something hard in his food. Mr. Perry stated that the pain did not begin until after he opened his mouth after that bite. Upon clinical examination, a crack on tooth #18 was noted. *Id.* Because crown restorations are not offered by the Indiana Department of Correction ("IDOC"), extraction was the only other viable option. Dkt. 56-1 at 4. Dr. Noll recommended that Mr. Perry be scheduled for extraction of tooth #18, and took an x-ray of the tooth. Dkt. 56-2 at 3-4. Mr. Perry declined pain medication at that time – Mr. Perry already had a bottle of ibuprofen that he purchased from commissary. *Id.*; Dkt. 69 at 14.

On March 11, 2016, Mr. Perry had an appointment with dental for the extraction of tooth #18 with local anesthetic. Dkt. 56-2 at 4. Before the procedure, Dr. Noll explained the risks to Mr. Perry, which include paresthesia, because the tooth is very near the inferior alveolar nerve, and paresthesia may result if that nerve is damaged. Dkt. 56-1 at 4. Mr. Perry signed an informed consent form indicating that the risks and consequences were explained to him, and that he

---

[2] Mr. Perry alleges that during the February 22, 2016 procedure, Dr. Noll used a drill and, with excessive force, cracked tooth #18. *See,* Dkt. 69 at 6. Mr. Perry failed to raise this claim in his complaint, and a response to a motion for summary judgment is not the appropriate place to raise a new claim. Moreover, he provides no evidence in support of this allegation and provides mere speculation that because his tooth was cracked on March 7, 2016, it must have been a result of the procedure from February 22, 2016. The Court will not consider his assertions as "facts" regarding what occurred during the February 22, 2016, procedure for purposes of this motion. *See* Local Rule 56-1(e).

understood the alternatives. Dkt. 56-2 at 10. The form specifically states, "I also release the Indiana Department of Correction and/or its employees from any unforeseen results therefrom." *Id.* However, Mr. Perry disputes that Dr. Noll explained the risks of the procedure to him or that there was a risk of temporary or permanent paresthesia. *See* Dkt. 68 at 2-3; Dkt. 69 at 9-10.

The mandibular inferior alveolar nerve runs along the length of the lower jaw in the center of the jawbone at a level near the tip of the roots of the teeth. Dkt. 56-1 at 4-5. Towards its end, it gives rise to the mental nerve that branches out and runs to the lower lip and chin area. Most cases of paresthesia occur in conjunction with the removal of lower third molars (wisdom teeth) and, to a lesser extent, second molars (the next tooth forward) because the nerves frequently lie near these teeth and thus are at risk for damage during the extraction process.

Dr. Noll has extracted approximately 800-1,000 teeth annually since beginning his dental practice in 1984. Dkt. 56-1 at 3. Most of his extractions are of maxillary (upper) and mandibular (lower) molars such as tooth #18, the tooth that Dr. Noll extracted for Mr. Perry in this case. *Id.* During dental school, students are given instruction in giving various local nerve blocks and infiltration techniques. This is part of the normal curriculum. Dr. Noll always uses local anesthetic when performing extractions of teeth. *Id.*

When extracting tooth #18, Dr. Noll generally administers local anesthetic by giving a block to the inferior alveolar nerve to numb the teeth, bone, and lingual nerve, and a buccal injection to numb the gingival tissues along the cheek side of the teeth. *Id.* at 5. With Mr. Perry, Dr. Noll administered both an inferior alveolar nerve block and an injection to numb the long buccal nerve. Dr. Noll used a total of three carpules of anesthetic, two of 4% articaine with 1/100k epinephrine and one carpule of .5% Marcaine with 1/200k epinephrine.[3] Although articaine has a

---

[3] Dr. Noll's assertion regarding his use of anesthetic is consistent with reputable literature on dental paresthesia. *See* Maha Ahmad, *The Anatomical Nature of Dental Paresthesia: A Quick Review*, Open Dent J., 155-159 (Feb. 2018),

5

higher documented incidence of paresthesia, it is also the most commonly used anesthetic because of its quick onset and moderate lasting time.[4]

The injections for the inferior alveolar nerve block are given within an area the size of a dime. There were three given plus the buccal injection. A 27-gauge needle is the size of needle typically used to give a block to the inferior alveolar nerve, and that is the size that Dr. Noll used. Dr. Noll inserted the needle to the lingual of the coronoid notch of the ramus of the mandible 6-10mm above the mandibular occlusal plane to a depth of approximately 25mm. The first injection was performed without incident. During the second injection, Dr. Noll asserts that Mr. Perry jumped, turned, and pulled his head away, which changed the needle position. Mr. Perry disputes that he jumped. Dkt. 69 at 11, 16. Mr. Perry asserts that he felt an electric burning pain that caused him to holler out in pain. Dkt. 69 at 4.

On occasion, a person receiving a dental injection may experience an "electrical shock" sensation upon insertion as the needle touches the trunk of their nerve. This is most common with blocks to the inferior alveolar nerve, the type of injection used to numb lower back teeth. Experiencing this phenomenon is not necessarily an indication that paresthesia will occur. The lingual nerve generally rolls off the bevel of the needle and is not harmed. If a nerve was injured in this case it would have been the inferior alveolar nerve, although Dr. Noll would not know that until Mr. Perry complained of the paresthesia. The other injections were given successfully without incident. According to Dr. Noll, other than Mr. Perry's movement (or "hollering") during

---

available at https://www.ncbi.nlm.nih.gov/pmc/ articles/PMC5838625/ ("Articaine is the anesthetic of choice used in many dental practices. … The formula most commonly used in US and Canada is Articaine hydrochloride 4% with epinephrine 1:100,000.").

[4] Dr. Noll's assertion regarding the popularity of anesthetic is consistent with reputable literature on dental paresthesia. *See id.* ("Articaine is the anesthetic of choice used in many dental practices. Its use is thought to be optimal; as it is proven to be efficient and it is easily diffusible through bone and tissue. … Gaffen and Haas (2009) reported that Articaine had the lion's share of paresthesia cases (59%) compared to other classes of anesthetic used between 1999 and 2008.") (internal citations omitted).

the second injection, there was no indication that he was in any pain during the procedure, as he was properly anesthetized. *Id.* at 5-6.

Injury to the inferior alveolar nerve is generally caused by three different things: trauma due to injury by the needle or surgical extraction procedure, pressure of the anesthetic in the confined space near the nerve, or an adverse reaction to the anesthetic. *Id.* at 6-7. All these possibilities are inherent risks of the procedure that, while rare, do occur. Seldom is the inferior alveolar nerve severed except upon third molar/wisdom tooth extraction, which did not occur in this case. For Mr. Perry, tooth #18 required sectioning and removal of the two roots individually. Due to the proximity of the roots to the inferior alveolar nerve, pressure from removing the roots could have caused bruising of the inferior alveolar nerve, which cannot be ruled out. The inferior alveolar nerve is nourished through nutrient and oxygen transport by the blood. If vessels lying near the nerve are damaged and bleed into the boney canal space in which the inferior alveolar nerve lies, the pressure can bruise the nerve just as a crushing injury might. A bruise can result in either temporary or permanent paresthesia. *Id.*

Although Dr. Noll cannot specifically state the cause of Mr. Perry's reported paresthesia, he feels that it was either a traumatic injury by the needle or a bruise of the nerve during surgical extraction. *Id.* at 7. Dr. Noll believes the inferior alveolar nerve to be damaged as opposed to the lingual nerve as evidenced by the area of paresthesia. Mr. Perry has sensation in his tongue and along his cheek and gingival, which rules out a lingual nerve injury. The end of Mr. Perry's chin still has paresthesia, and this implicates the inferior alveolar nerve. The vast majority of cases of paresthesia resulting from anesthesia involve inferior alveolar nerve blocks. Unfortunately, there is no way for a dentist to anticipate beforehand which dental injections might result in this complication. *Id.* at 7.

Dr. Noll is aware of no treatment for paresthesia. *Id.* at 7.[5] In most cases, the paresthesia is transient, resolving on its own after just a few days or weeks. With some cases, the condition is best classified as persistent, lasting longer than six months. For a small number of cases, the loss is permanent.[6] Dr. Noll has only had one other case of mandibular paresthesia in his career out of thousands of patients, and that resolved on its own in nine months. *Id.*

After the procedure, Dr. Noll prescribed Mr. Perry ibuprofen to take as needed for pain. Dkt. 56-2 at 4, 11.

On March 14, 2016, Mr. Perry submitted RFHC #182834 requesting to be examined by a neurologist. *Id.* at 12. He wrote that Dr. Noll had improperly administered the anesthetic, causing loss of feeling in the lower left side of the lip and chin resulting in the nerves in his left eye to twitch. He saw a nurse for his complaints on March 18, 2016, and she noted he could raise his eyebrows, smile, open his mouth, and stick out his tongue with no issues. *Id.* at 13-14. He was not drooling, had no issues swallowing, and was in no pain.

Mr. Perry submitted another request to see a doctor on March 26, 2016. *Id.* at 15. On April 1, 2016, Mr. Perry saw Dr. Paul Talbot for his complaints that his lower lip still felt numb from the extraction. *Id.* at 17-18. He told Dr. Talbot that Dr. Noll had counseled him that the numbness was a normal occurrence. *Id.* at 17. Dr. Talbot noted there was no evidence of infection or gum pain, and the gums were pink with no redness, drainage, or swelling. Dr. Noll did previously educate Mr. Perry that numbness was not an uncommon occurrence after such a procedure, and

---

[5] Mr. Perry disputes that Dr. Noll is aware of no treatment for paresthesia. Dkt. 69 at 9. However, Mr. Perry's evidence in support is a statement from Dr. Alderman, not Dr. Noll, that the best treatment for permanent paresthesia is surgical intervention, and a letter from Mr. Perry requesting that surgery be provided as part of his settlement. *Id.* Mr. Perry fails to controvert Dr. Noll's assertion that he is aware of no treatment for paresthesia. *See* Local Rule 56-1(f).

[6] Dr. Noll's summary of paresthesia is consistent with the description of paresthesia on WebMD. *See* https://www.webmd.com/oral-health/wisdom-teeth#3.

that it normally resolved on its own in days, weeks, or months. Dkt. 56-1 at 8. At that time, Dr. Noll fully expected that his paresthesia would quickly resolve on its own. *Id.*

On April 8, 2016, Mr. Perry came into the dental clinic and immediately handed the assistant an informal grievance form. Dkt. 56-2 at 4-5. He complained that the extraction site was not healing and was still bleeding. He also had a few pieces of sequestered bone fragments. Mr. Perry had continually placed gauze over the extraction site, not allowing the tissue to completely come together. However, the extraction site was only 1.5 mm from complete closure. Dr. Noll informed Mr. Perry that he would not heal properly if he continued to place undue pressure on the site with gauze. An x-ray of the extraction site appeared normal. Mr. Perry also complained of slight paresthesia on the end of his chin. Dr. Noll educated him that the feeling usually returns with time as the inferior alveolar nerve may have been bruised. Dr. Noll informed Mr. Perry that he would reschedule his cleaning in two weeks to allow the extraction site to finish healing, but Mr. Perry elected to sign a refusal form instead. Dkt. 56-2 at 4-5, 19. Mr. Perry thereafter refused to return to dental. Dkt. 56-1 at 8-9. Mr. Perry clarifies that he merely refused anymore treatment from Dr. Noll, but was not refusing dental treatment from another dentist. Dkt. 69 at 19.

Mr. Perry did not submit any RFHC about his teeth or nerve, or otherwise make any dental complaints, for several months. On November 28, 2016, Mr. Perry submitted RFHC #206802 to Dr. Noll where he wrote that Dr. Noll had accidentally inserted the needle and "burned" the nerves on the left side of his jaw line, lower lip, and left side of his chin. Dkt. 56-2 at 20. Mr. Perry added that he was contacting Dr. Noll because Dr. Noll had told him that nerve restoration would occur in three to six months, but it had not returned. However, he wrote, "Do not send request from your office for me to be examined by you they will be refused." Instead, Mr. Perry wrote that he wanted

9

to see a nerve specialist at an outside hospital. The facility's Health Service Administrator responded that any request to see an off-site specialist had to be made by the dental team, and Mr. Perry would have to see Dr. Noll for an assessment before Dr. Noll could send him to a specialist. Dkt. 56-2 at 20.

Mr. Perry did not follow up with another request until January 7, 2017, when he submitted RFHC #201846, again requesting to be seen by a neurologist to assess the damage to his facial nerves. Dkt. 56-2 at 21. Mr. Perry saw a nurse on January 18, 2017 for his numbness. Dkt. 56-2 at 22-23. Mr. Perry reported that he was unable to feel the left side of his lower bottom lip and chin, but the nurse noted that his smile was even with no dropping or crookedness.

On January 23, 2017, Mr. Perry saw Nurse Murage for loss of sensation in his mouth. Dkt. 56-2 at 24-26. He stated that he had sent in a request for follow-up "at 8 months" and was still waiting for an appointment with dental. *Id.* Nurse Murage encouraged him to wait for an appointment with Dr. Noll for further evaluation and management, and she referred him back to Dr. Noll. *Id.* at 26. She also scheduled him for a follow-up visit in two months. *Id.*

On March 23, 2017, Mr. Perry returned to see Nurse Murage for his follow-up appointment. *Id.* at 27. He reported he still had not had a dental appointment, so Nurse Murage contacted Dr. Noll to see if he could see Mr. Perry that day. *Id.* Dr. Noll was available, so Mr. Perry was sent to Dr. Noll for an examination. *Id.* Using a dental explorer, Dr. Noll gently touched different areas of his gingivae, other oral mucosa, inner cheek, lip, etc. Dkt. 56-2 at 29. No paresthesia was noted in these areas. The area still having paresthesia seemed to be the end of his chin along the lower jaw line until the angle of his ramus. *Id.* Dr. Noll submitted a referral to oral surgeon Dr. Rob Alderman ("Dr. Alderman") for a panoramic x-ray and evaluation of his paresthesia. *Id.*

On June 22, 2017, Dr. Noll noted that orders had been placed for a panoramic x-ray and evaluation of Mr. Perry's paresthesia on March 23, 2017, while Corizon had the IDOC contract. *Id.* However, Wexford Health Services took over the contract at the end of March and required an outpatient request ("OPR") for patients to be seen by Dr. Alderman. Dr. Noll submitted an OPR for Mr. Perry to see Dr. Alderman. *Id.*

On July 5, 2017, Mr. Perry saw Dr. Alderman for his complaints of paresthesia. *Id.* at 29-30. Mr. Perry reported that it had already been approximately 16 months since the extraction of tooth #18. He reported that when the mandibular nerve block was administered for his extraction, he experienced an electrical shock-like sensation on the left side of his lower lip. Since that time, he had lost sensation on the outside of his face extending from the midline of his lower lip to the left corner of the mouth, down to and including his chin. He denied any improvement during the 16 months. Dr. Alderman performed a series of tests to determine whether Mr. Perry had feeling in those areas, and the tests were negative. Upon examination, Mr. Perry had no facial swelling or cervical lymph adenopathy (swollen lymph nodes). Mr. Perry's MIO (maximum incisal opening), or how wide he could open his mouth, was within normal limits. Mr. Perry's oral hygiene (OH) was fair. A soft tissue examination was within normal limits, and a panoramic x-ray showed no bony pathology. Dr. Alderman assessed left-sided mandibular nerve (CN V3) paresthesia. He suspected neuroma formation with subsequent paresthesia involving the inferior alveolar nerve branch of the CN V3. A neuroma can refer to any swelling around a nerve. Dr. Alderman reviewed his clinical findings and treatment options in detail with Mr. Perry. They discussed a steroid regimen, but Dr. Alderman believed it would be of little to no benefit. He concluded the best treatment option at this point would be surgical intervention. *Id.* at 30-31.

### III. <u>DISCUSSION</u>

The defendants move for summary judgment on Mr. Perry's claims, asserting that the evidence shows that Dr. Noll did not disregard any substantial risk of harm of which he was subjectively aware, and his medical malpractice claim against Corizon fails because he cannot establish a *prima facie* case of negligence or malpractice against Dr. Noll. *See* Dkt. 55. In response, Mr. Perry argues that Dr. Noll was deliberately indifferent for: (1) failing to explain the risks associated with local anesthesia; (2) improperly using articaine with its higher than expected frequency of paresthesia; (3) ignoring his requests for health care and failing to refer him to an oral surgeon or neurologist sooner; and (4) continuing anesthesia shots despite his hollering in pain after the second shot. *See*, Dkt. 68 at 2-4, Dkt. 69 at 7-8, 17, 23-27. Mr. Perry asserts Corizon is liable for Dr. Noll's medical malpractice based on the Indiana Attorney General's Office writing to tell him that his claim should be filed directly with Corizon. *See* Dkt. 69. He also asserts that expert evidence is not required where the issues is one within the common knowledge of lay people such as himself. Dkt. 69 at 30. In reply, the Defendants assert that Mr. Perry failed to present any admissible evidence to create a genuine issue of material fact, and reiterate their position that Dr. Noll was not deliberately indifferent to Mr. Perry's serious medical need. Dkt. 72.

A. **Eighth Amendment Deliberate Indifference Claim**

Mr. Perry asserts an Eighth Amendment medical care claim against Corizon. At all times relevant to Mr. Perry's claim, he was a convicted inmate. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). Something more than negligence or even malpractice is required. *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). A successful § 1983 plaintiff must also establish not only that a state actor violated his constitutional rights, but that the violation caused the plaintiff injury or damages. *Roe v. Elyea*, 631 F.3d 843, 846 (7th Cir. 2011) (citation omitted).

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's]

ailments"). "Under the Eighth Amendment, [a plaintiff] is not entitled to demand specific care. [He] is not entitled to the best care possible. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to [him]." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted).

The Defendants do not dispute that Mr. Perry's dental complaints constitute an objectively serious medical need. Dkt. 55 at 14. Rather, they dispute Mr. Perry's allegation that Dr. Noll was deliberately indifferent. Mr. Perry primarily argues that Dr. Noll was deliberately indifferent in four ways: for (1) failing to explain the risks associated with local anesthesia; (2) improperly using articaine with its higher than expected frequency of paresthesia; (3) ignoring his requests for health care and failing to refer him to an oral surgeon or neurologist sooner; and (4) continuing anesthesia shots despite his hollering in pain after the second shot. Each is discussed in turn.

First, Mr. Perry argues Dr. Noll was deliberately indifferent for failing to explain the risks associated with local anesthesia. Although there is a dispute as to whether the risks were properly explained, the dispute is not material. As an initial matter, Mr. Perry failed to raise a claim that Dr. Noll failed to explain the risks associated with local anesthesia in his complaint or amended complaint. Moreover, disclosure of the risks associated with articaine does not implicate whether Dr. Noll "must have known that [Mr. Perry] 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Freeman*, 394 F.3d at 478. Mr. Perry admits that he had undergone local anesthesia with articaine

14

on three prior occasions with no complications, Dkt. 69 at 13, and asserts merely that if the risks had been explained, he would have refused the first procedure[7] – when Dr. Noll restored the resin on tooth #18 on February 22, 2016 – and makes no allegations regarding the tooth extraction. *See* Dkt. 68 at 4. However, Mr. Perry's allegations are not directed to the February 22, 2016, procedure, but rather the March 11, 2016, tooth extraction. Because Mr. Perry fails to show that Dr. Noll knew of a serious risk to him and disregarded that risk by failing to explain the risks of local anesthesia, summary judgment on this claim is appropriate for Dr. Noll.

Mr. Perry next disagrees with Dr. Noll's use of articaine, but Dr. Noll testified that articaine is commonly used because of its quick onset and moderate lasting time. Dr. Noll's testimony is supported by reputable literature on dental anesthesia. *See* Maha Ahmad, *The Anatomical Nature of Dental Paresthesia: A Quick Review*, Open Dent J., 155-159 (Feb. 2018), available at https://www.ncbi.nlm.nih.gov/pmc/ articles/PMC5838625/. ("Articaine is the anesthetic of choice used in many dental practices. Its use is thought to be optimal; as it is proven to be efficient and it is easily diffusible through bone and tissue."); N. Nizharadze, et. al, *Articaine – The Best Choice Of Local Anesthetic In Contemporary Dentistry*, Georgian Med News, 15-23 (Jan. 2011), available at https://www.ncbi.nlm.nih.gov/pubmed/21346262 ("Within the rich local anesthetic drugs available in dentistry for the prevention and management of pain 4% articaine solutions achieve highest level of anesthetic potency and lowest systemic toxicity in all clinical situations, prior to its superlative physicochemical characteristics and the pharmacological profile."). Nor has Mr. Perry provided evidence that Dr. Noll knew that Mr. Perry had a specific risk to developing paresthesia in response to articaine. *See Cox v. Brubaker*, 558 Fed. Appx. 677, 678 (7th Cir. 2014)

---

[7] Mr. Perry's ire with Dr. Noll appears to arise primarily from his belief that Dr. Noll caused the crack in his tooth while drilling on February 22, 2016, and "covered-up" his mistake with resin. However, that is not the claim raised in this action.

(noting that summary judgment was properly granted where an inmate "had not produced evidence that the defendants knew of and disregarded a significant risk that Cox would experience any serious side effects of Pamelor"). Because Dr. Noll's decision to use articaine was not "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment," *Norfleet*, 439 F.3d at 396, Dr. Noll is entitled to deference and summary judgment on his decision to use articaine.

Mr. Perry next argues that Dr. Noll was deliberately indifferent for ignoring his requests for health care and failing to refer him to an oral surgeon or neurologist for nine months. *See* Dkt. 69 at 7-8. Specifically, he argues that Dr. Noll knew by March 14, 2016, that he was experiencing paresthesia. However, as the Defendants point out, RFHC #182834 submitted on March 14, 2016, requested health care services from "Other," specifically a neurologist. The RFHC was eventually referred to Dr. Talbot. There is no evidence that Dr. Noll read RFHC #182834 or was aware of Mr. Perry's continuing dental problems on this date. Similarly, RFHC #196266 submitted on March 26, 2016, requested health care services from "Other," specifically a neurologist. Mr. Perry did not request to talk to or see a dental provider. On April 8, 2016, Mr. Perry came into the dental clinic with an informal grievance form. Among other issues, he complained of slight paresthesia on the end of his chin. Dr. Noll educated him that the feeling usually returns with time as the inferior alveolar nerve may have been bruised. Dr. Noll informed Mr. Perry that he would reschedule his cleaning in two weeks to allow the extraction site to finish healing, but Mr. Perry refused any more treatment from Dr. Noll. Mr. Perry did not submit any RFHC about his teeth or nerve, or otherwise make any dental complaints until RFHC #206802 on November 28, 2016. Even then, Mr. Perry wrote "Do not send request from your office for me to be examined by you they will be refused."

Dr. Noll testified that in most cases paresthesia resolves on its own in just a few days or weeks, and that he fully expected Mr. Perry's paresthesia to quickly resolve itself.[8] Moreover, Dr. Noll testified that he is aware of no treatment for paresthesia. Mr. Perry has failed to show that Dr. Noll "knew about [Mr. Perry's paresthesia]" during the period between March 23, 2016 and November 28, 2016, and ignored his request for help. Moreover, Mr. Perry has failed to show that Dr. Noll improperly failed to refer him to a neurologist or outside specialist for months. Even if Dr. Noll knew of Mr. Perry's paresthesia, because Dr. Noll is not aware of any treatment for paresthesia and testified that paresthesia generally resolves itself, it cannot be deliberate indifference for Dr. Noll to have failed to refer Mr. Perry to a neurologist or oral surgeon.

Finally, Mr. Perry asserts that Dr. Noll was deliberately indifferent for continuing anesthesia shots after Mr. Perry "hollered" in pain after the second shot. *See* Dkt. 68 at 4; Dkt. 69 at 17. As an initial matter, Mr. Perry did not raise an Eighth Amendment claim against Dr. Noll related to any pain from the anesthesia shots. Regardless, Dr. Noll testified that "a person receiving a dental injection may experience an 'electrical shock' sensation upon insertion as the needle touches the trunk of their nerve," but that this is "not necessarily an indication that paresthesia will occur." He further testified that "there was no indication that [Mr. Perry] was in any pain during the procedure, as he was properly anesthetized." Indeed, Mr. Perry has only testified that he hollered in pain after the second shot, but does not assert that he experienced any further pain. Mr. Perry is unable to show that just because he experienced one moment of pain during the second shot, the entire procedure should have been stopped. Nor is Mr. Perry constitutionally entitled to a pain-free dental extraction. *See Lake v. Wexford Health Sources, Inc.*, 848 F.3d 797, 799 (7th

---

[8] Mr. Perry argues that if Dr. Noll had sent him to see an oral surgeon immediately, the effects of the paresthesia could have been reversed. *See* Dkt. 69 at 8. However, Mr. Perry merely speculates and provides no evidence in support of his assertion.

17

Cir. 2017) (affirming grant of summary judgment to defendant-dentist on inmate's claim that tooth extraction was not pain-free when the dentist submitted an uncontroverted affidavit in which she testified that she believed that the anesthesia techniques she intended to use would have enabled her to extract the tooth with minimal discomfort). Mr. Perry fails to show that Dr. Noll disregarded any substantial risk of harm by continuing the tooth extraction.

Thus, for the reasons above, Dr. Noll is entitled to summary judgment on Mr. Perry's Eighth Amendment claim against him.

**B.** **Medical Malpractice Claim**

Mr. Perry asserts a medical malpractice claim against Corizon. In order for Mr. Perry to succeed on a medical malpractice claim, he must prove that a doctor owed him "a duty of care, that the doctor's actions did not conform to that standard of care, and that [Mr. Perry] was proximately injured by the doctor's breach." *Collins v. Al-Shami*, 851 F.3d 727, 734 (7th Cir. 2017) (citing *McSwane v. Bloomington Hosp. & Healthcare Sys.*, 916 N.E.2d 906, 910 (Ind. 2009)). In addition, "under Indiana law a prima facie case in medical malpractice cannot be established without expert medical testimony." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 753 (7th Cir. 2004). "A plaintiff must present expert testimony to establish the applicable standard of care and to show whether the defendant's conduct falls below the standard of care." *Id*. at 760. Corizon may be liable only where its employee committed a tort. *See Griffin v. Simpson*, 948 N.E.2d 354, 361 (Ind. Ct. App. 2011) (holding that under Indiana law, where the employee did not commit a tort, *respondeat superior* cannot apply to make the employer liable).

Mr. Perry has presented no expert testimony to rebut the standard of care presented in the affidavit submitted by Dr. Noll, one of Corizon's employees, and supported by external sources. Nor has Mr. Perry presented any evidence demonstrating that the Corizon medical staff's treatment

fell below the applicable standard of care. Because Mr. Perry fails to show medical malpractice by any of Corizon's employees, his medical malpractice claim against Corizon also fails. Accordingly, summary judgment for Corizon on Mr. Perry's medical malpractice claim is appropriate.

## IV. <u>CONCLUSION</u>

It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton,* 118 S. Ct. 1584, 1598 (1998). This is a vital role in the management of court dockets, in the delivery of justice to individual litigants, and in meeting society's expectations that a system of justice operate effectively. Indeed, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained," and in such cases, summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

Mr. Perry has not identified a genuine issue of material fact as to his claims in this case and the Defendants are entitled to judgment as a matter of law. Therefore, the Defendants' Motion for Summary Judgment, Dkt. 54, is **GRANTED.**

Judgment consistent with this Entry shall now issue.

**SO ORDERED.**

Date: 8/3/2018

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Rodney Steven Perry, Sr., #974441
PENDLETON CORRECTIONAL FACILITY
4490 West Reformatory Road
Pendleton, Indiana  46064

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com